US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JUL 2 4 2019

DOUGLAS F. YOUNG, Clerk
By
 Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                    CASE NO. 5:18-CR-50092-2

PAYTEN A. WILSON                                             DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendant Payten A. Wilson's Motion to Suppress Evidence (Doc. 37) and Memorandum in Support (Doc. 38), and the Government's Response (Doc. 44). For the reasons given below, Ms. Wilson's Motion is **DENIED**.

### I. BACKGROUND

On December 13, 2018, Ms. Wilson and her codefendant, Kyle G. Thomas, were charged by Indictment (Doc. 3) with various felony counts related to methamphetamine distribution. Mr. Thomas was also charged in that same instrument with being a previously-convicted felon in possession of a firearm. Three months later, on March 14, 2019, a grand jury returned a Superseding Indictment (Doc. 28) containing essentially the same charges against the same two individuals. Ms. Wilson faces two counts: Count Four of the Superseding Indictment charges her and Mr. Thomas with conspiring together to distribute more than 50 grams of a mixture or substance containing methamphetamine, and Count Five charges her with possessing methamphetamine with the intent to distribute it. *See id.* at 2.

Both charges against Ms. Wilson stem from an encounter that she, Mr. Thomas, and two other individuals had with police in the early morning hours of October 29, 2018.

1

Ms. Wilson was driving a Chrysler 300 in which Mr. Thomas and two other passengers were riding when, around 5:17 a.m., she was pulled over by a police officer with the Fayetteville Police Department named Justin Harlan. The traffic stop occurred on Interstate 49, near Martin Luther King Junior Boulevard, in Fayetteville, Arkansas. Roughly forty minutes later, following an alert by a drug-sniffing dog, police officers searched the car and found methamphetamine, marijuana, and several hypodermic syringes. Ms. Wilson and the front passenger were both arrested for possession of drug paraphernalia because the syringes were found within arm's reach of both of their seats, in the front center console. Later, Ms. Wilson informed a detective on the scene that in her sports bra she had hidden three baggies of methamphetamine, which she then retrieved and provided to him. Ms. Wilson was eventually taken from the traffic stop to the Washington County Detention Center.

In her Motion to Suppress, Ms. Wilson asks this Court to suppress all evidence obtained from the car's search, as well as evidence of her confession and of the methamphetamine that was hidden in her sports bra. She advances three arguments in support of this request: (1) that Officer Harlan lacked probable cause to make the initial traffic stop; (2) that Officer Harlan impermissibly extended the traffic stop; and (3) that there was no probable cause to arrest her for drug paraphernalia. The Motion has been fully briefed, and was the subject of an evidentiary hearing on July 15, 2019. The Court received oral argument from the parties at the conclusion of that hearing. Thus, the matter is now ripe for decision.

## II. LEGAL STANDARD

The United States Constitution imposes certain well-known limitations on searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV. A large body of judicial precedent has developed, especially over the last six decades, articulating more precisely how the Fourth Amendment should be applied to a variety of factual contexts. As with so many other areas of the law, the devil is in the details.

A police officer may briefly seize or search a person without a warrant or probable cause if he reasonably suspects that criminal activity is afoot, but only if that suspicion is based on "specific and articulable facts . . . taken together with rational inferences from those facts." *See Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). When a court is asked to determine whether that officer's suspicion was reasonable, it must ask whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate." *See id.* at 21–22 (internal quotation marks omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005).

In a traffic stop, as with any other brief detention based on reasonable suspicion, "the tolerable duration of [a] police inquir[y] . . . is determined by the seizure's 'mission'—

to address the traffic violation that warranted the stop, and attend to related safety concerns." See *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)) (alterations in original). However, if during the traffic stop the officer develops the reasonable suspicion that some additional criminal activity is afoot, then he may prolong the stop to investigate the new matter. *See id.*; *see also United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." *Linkous*, 285 F.3d at 720 (internal quotation marks omitted).

However, although reasonable suspicion of additional criminal activity is sufficient to expand the scope and duration of a traffic stop, probable cause is necessary to conduct a search of the vehicle. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks and alterations omitted). This standard is not one of "rigid rules, bright-line tests, and mechanistic inquiries," but rather is based on "the totality of the circumstances." *See id.* at 244. Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully,

4

reduced to a neat set of legal rules." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). For example, probable cause to search a car for drugs may be provided by a reliable alert from a drug-sniffing dog—but like all probable-cause analyses, it must be based on the totality of the circumstances, with the ultimate question being "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *See id.* at 248.

Another important wrinkle in Fourth Amendment precedent is something known as the collective-knowledge doctrine. "The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008). The collective-knowledge doctrine applies not only to reasonable-suspicion inquiries, but also to probable-cause inquiries. "Probable cause for the stop and search of [a] vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017).

When a defendant in a criminal case believes that evidence against her was obtained from an unconstitutional search or seizure, she may move to exclude that evidence from trial as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963). Although ordinarily defendants bear the burden of proof on motions to suppress, there are a variety of exceptions to this rule—one of which applies

when a motion to suppress challenges the existence of probable cause for a warrantless search or seizure. *See, e.g., United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006) (referring to the possibility that in the suppression hearing below the Government might have "failed in its burden to prove that Deputy Brown had probable cause to stop Mr. Andrews's car"); *see also Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search."); *cf. Recznik v. City of Lorain*, 393 U.S. 166, 169–70 (1968) (holding that a "motion to suppress should have been granted" because the prosecutor "did not meet the burden of showing probable cause"). Since that is the posture here, the Government bears the burden of proving by a preponderance of the evidence that the October 29, 2018 traffic stop and the various seizures or searches arising from it, were all supported by reasonable suspicion or probable cause, as appropriate. *Cf. United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("In any event, the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005) (requiring Government to prove voluntary consent to a warrantless search by a preponderance of the evidence); *United States v. James*, 353 F.3d 606, 616–17 (8th Cir. 2003) (requiring Government to prove by a preponderance of the evidence that unlawfully obtained information would inevitably have been discovered by lawful means). In applying this burden it is important to remember that "preponderance of the evidence," "probable cause," and "reasonable suspicion" are all different standards. *Florida v. Harris*, 568 U.S. at 243–44. To reiterate, and to be perfectly clear: the Government must prove by a preponderance of the evidence that the warrantless search

or seizure in question was supported by probable cause or that reasonable suspicion existed. It is *not* the Government's burden to prove that the warrantless search or seizure was supported by a preponderance of the evidence.

## III. DISCUSSION

Having clarified the applicable legal standard, the Court must now apply it to the facts at hand. The Court would begin by observing that none of the facts recited above in the "Background" section of this Opinion appear to be disputed by the parties. But at any rate, the Court finds that all of those facts have been very well established by a preponderance of the evidence, not the least of which is the uncontroverted evidence provided by the recordings that were received into evidence at the July 15, 2019 hearing.

However, there are some additional facts, as yet unmentioned in this Opinion, which end up making the resolution of this Motion a simple task. It turns out that actually this was never an ordinary traffic stop. Instead, unbeknownst to Ms. Wilson when it occurred, the stop was initiated as part of an ongoing drug-trafficking investigation. A confidential informant ("CI") had previously been used to make a controlled purchase of methamphetamine from Kyle Thomas (who, the reader will recall, is Ms. Wilson's codefendant and was one of the Chrysler's occupants when it was pulled over). Soon afterward, on the night before the traffic stop, Detective Charles McIlroy installed a GPS tracker on that very same vehicle in order to track it on a trip to Little Rock and back from Fayetteville, because his CI had previously informed him the trip would be made for the purpose of obtaining a large quantity of methamphetamine for distribution in northwest Arkansas.

At Detective McIlroy's request, Officer Harlan set up at the spot where the traffic stop was eventually made, in order to await the vehicle's return from Little Rock and to initiate a traffic stop in furtherance of that narcotics investigation. In addition to tracking the Chrysler via GPS, Detective McIlroy began physically following the vehicle on its return trip once it drew near Fayetteville. He then informed Officer Harlan, either over phone or radio, that the target was approaching Fayetteville, and he asked Officer Harlan to initiate a traffic stop when the vehicle arrived. Although Officer Harlan was already aware of the ongoing drug investigation and of the true purpose for the planned stop, he and Detective McIlroy wanted the traffic stop to appear like an ordinary traffic stop to the occupants of the vehicle, so as to protect the identity of the CI. Accordingly, Detective McIlroy informed Officer Harlan of several traffic violations that he observed the vehicle making while he was tailing it on the approach to Fayetteville.

Consistently with this ruse, when Officer Harlan pulled the Chrysler over he made statements to the occupants indicating that the reason for the stop was that the vehicle had been speeding. He then attempted to develop independent probable cause to search the vehicle apart from the information that he had already received from Detective McIlroy—again, so as to protect the CI's identity by giving the appearance to the vehicle's occupants that the true reason for their trip had been independently discovered over the course of the stop. These efforts included interviewing the vehicle's occupants, running background checks on them with the dispatcher, asking them for consent to search the vehicle, summoning a drug-dog once consent to search was refused, and then eventually performing a search of the vehicle after the drug-dog arrived and alerted.

The Court finds all of the foregoing facts to be established by a preponderance of the evidence. They were all testified to at the July 15 evidentiary hearing by either Officer Harlan, Detective McIlroy, or in many cases, both. None of these facts were contradicted by any other evidence in the record; indeed, the independent evidence corroborates them, or is at least consistent with them. For example, at the beginning of the dashboard camera recording, and again at various times throughout the stop, Officer Harlan can be heard communicating with Detective McIlroy about how to proceed. That same recording, along with the officers' body camera recordings, show the investigation playing out in a manner consistently with how the above-described testimony depicted it. And those same recordings show Detective McIlroy eventually arriving on the scene of the traffic stop and participating in the search of the vehicle.

These facts are very strongly (though not perfectly) analogous to those in the case of *United States v. Rowe*, 878 F.3d 623 (8th Cir. 2017). That case is binding authority on this Court, and it leaves no room for doubt on how the instant Motion should be decided. It is worth quoting *Rowe* at length here to illustrate the strong factual and analytical similarity:

> Investigating officers received information from a confidential reliable source regarding the drug dealings of Houston Oliver, and others, specifically alerting them to a large shipment of drugs on November 30 coming from Arizona to Minnesota in a BMW specifically described by the CI. The CI conveyed this information on the heels of telling officers about the shipment via mail of cocaine from the same individual that resulted in a successful interception. Based on this information, the alert went out via dispatch on November 30 and thus alerted Trooper Thul to the possibility that this BMW would be on the roadway that night. Before she identified the vehicle, however, she received a call from investigators working the case that they had spotted the car and asked that she conduct a stop. Once pulled over, Rowe himself corroborated the information provided by the CI. Rowe affirmed that he was driving "Houston's" car from Arizona to Minnesota as indicated by the informant.

9

> The district court held that despite Trooper Thul's explanation that she pulled the car over for the overly tinted windows, the probable cause that already existed from the CI's information was enough in this case. Specifically, the court held that "[b]ased on this probable cause to believe that the BMW contained cocaine, the police were authorized under the automobile exception to stop, search, and seize the vehicle without a warrant." Based on our de novo review of the record, we also conclude that the collective knowledge of the officers support the stop and detention of Rowe, as well as the later search of the impounded vehicle.
>
> * * *
>
> The error in Rowe's argument is his focus on the fact that Trooper Thul effectuated an investigatory stop based only on the excessive window tint. The stop was not unconstitutionally expanded given that the entire basis for the stop was the drug interdiction, despite the trooper's alternate reasoning offered.

*Id.* at 629. This reasoning flows quite naturally from the well-established principle that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

Accordingly, this Court finds by a preponderance of the evidence that, at the time of the traffic stop, the collective knowledge held by the officers working the drug investigation in this case can be imputed to Officer Harlan from his communications about that investigation with Detective McIlroy, and that this collective knowledge provided sufficient probable cause to support not only the traffic stop's initiation, but also the stop's actual scope and duration, as well as the eventual warrantless search of the car for methamphetamine. It does not matter whether Officer Harlan ever succeeded at developing independent probable cause to search the car during the traffic stop. It also does not matter that the ostensible reason for the stop given to the occupants was a mere traffic violation. And it does not matter whether Officer Harlan actually observed any purported traffic violation. The real purpose of this traffic stop was drug interdiction, based

on information received from a CI who had previously performed a controlled buy in the same investigation, and which information was corroborated by data received from a GPS tracking device that had previously been placed on the vehicle by investigators. The vehicle was lawfully pulled over and lawfully searched, and the fruits of that search were lawfully obtained.

The Court further finds by a preponderance of the evidence that the collective knowledge of the officers involved in this investigation provided Officer Harlan reasonable suspicion to justify detaining Ms. Wilson throughout the traffic stop, in order to investigate what connection, if any, she had to the drugs he had probable cause to believe were located in that vehicle. After all, she was the person driving it. And once the search of the vehicle produced not only almost 150 grams of methamphetamine from a bag in the floorboard of the back seat area, but also several syringes hidden in the front center console within arm's reach of the driver's and front passenger's seats, there was probable cause to arrest Ms. Wilson for possession of drug paraphernalia.

Ms. Wilson points out, correctly, that upon learning that Ms. Wilson was being arrested for possession of drug paraphernalia, the owner of the vehicle (who was also an occupant at the time of the stop) insisted to one or more officers that the syringes belonged to a diabetic family member of his, and were not Ms. Wilson's. She then cites the 1948 United States Supreme Court case of *United States v. Di Re* for the proposition that "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person." 332 U.S. 581, 593. But the Court does not understand that sentence from *Di Re* to be announcing any sort of bright-line rule with respect to probable-cause analysis. Indeed, as was already observed in

Section II of this Opinion, in the much more recent case of *Florida v. Harris* the Supreme Court emphasized that it has "rejected rigid rules, bright-line tests, and mechanistic inquiries" for probable-cause analysis. 568 U.S. at 244.

Here, at the time of Ms. Wilson's arrest for possession of drug paraphernalia, the facts available to the officers indicated that several hypodermic syringes had been within arm's reach of her, inside a car that she was driving which also contained a large amount of methamphetamine—a car which had just made an overnight trip to and from Little Rock (where it had remained only one hour before heading back to Fayetteville), with a CI having previously informed officers that the trip would be made for the purpose of acquiring a large amount of methamphetamine. Considered alone, these facts would amply support the existence of probable cause for a reasonable officer in that situation to believe that the syringes in question were drug paraphernalia, and that Ms. Wilson was at least in joint, constructive possession of them. Of course, a totality-of-the-circumstances analysis cannot ignore the car owner's contemporaneous insistence that the syringes were used by his diabetic family member to inject insulin and did not belong to Ms. Wilson. This fact does tend to point in a different direction from all the other facts just mentioned. But the question here is not whether the Government could prove beyond a reasonable doubt, or even by a preponderance of the evidence, that Ms. Wilson possessed drug paraphernalia. Rather, the question here is whether a reasonable officer on the scene of the arrest, taking the totality of the circumstances into account, would have probable cause to arrest her for possession of drug paraphernalia. And considering the totality of the circumstances, the Court finds such probable cause existed here.

So, again, the Court finds that there was probable cause to arrest Ms. Wilson for possession of drug paraphernalia, and reasonable suspicion to support further investigation of her connection to the methamphetamine in the car. Thus, Ms. Wilson's subsequent admission to officers regarding the methamphetamine hidden in her sports bra was lawfully obtained, as was the methamphetamine itself which she then recovered and provided to them.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Payten A. Wilson's Motion to Suppress Evidence (Doc. 37) is **DENIED**. This case will be set for trial in a separate scheduling order.

**IT IS SO ORDERED** on this 24th day of July, 2019.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE